137 Nev., Advance Opinion 17

IN THE COURT OF APPEALS OF THE STATE OF NEVADA

RALPH EDMOND GOAD,
Appellant,
vs.
THE STATE OF NEVADA,
Respondent.

No. 79977-COA

FILED

APR 29 2021

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY S. Young
DEPUTY CLERK

Appeal from a judgment of conviction, pursuant to a jury verdict, of murder with the use of a deadly weapon. Second Judicial District Court, Washoe County; David A. Hardy, Judge.

*Vacated and remanded.*

John L. Arrascada, Public Defender, and Kathryn Reynolds, Deputy Public Defender, Washoe County,
for Appellant.

Aaron D. Ford, Attorney General, Carson City; Christopher J. Hicks, District Attorney, and Kevin Naughton, Appellate Deputy District Attorney, Washoe County,
for Respondent.

_____

BEFORE GIBBONS, C.J., TAO and BULLA, JJ.

## OPINION

By the Court, GIBBONS, C.J.:

The United States and Nevada Constitutions prohibit trying a criminal defendant while he is mentally incompetent. An incompetent defendant lacks the requisite mental cognizance to receive a fair trial and appreciate the rights associated therewith. A defendant cannot, among

21-12364

other things, effectively assist counsel, confront witnesses, or intelligently decide whether to testify or remain silent. Thus, both the United States and Nevada Supreme Courts have recognized that conviction of an incompetent criminal defendant violates due process.

The right to stand trial while competent being paramount, the United States Supreme Court has recognized a procedural due process right to a hearing to determine whether a defendant is competent if sufficient doubt of competency arises at any time. The Nevada Supreme Court has embraced this right by requiring a trial court to order a competency hearing sua sponte when any evidence before the court—in isolation or in light of other evidence—gives rise to reasonable doubt as to the defendant's competency. Nevada prescribes statutory procedures that trial courts must follow when determining whether doubt is reasonable. If there is such doubt, the court must conduct a competency hearing; neither the defendant nor defense counsel can waive the right to a hearing. The Nevada Supreme Court has consistently remedied violations of a defendant's right to a competency hearing with reversal of the conviction and remand for a new trial but has not mandated that a new trial is the only permissible remedy.

This case presents three questions that Nevada competency jurisprudence has yet to answer or clarify. First, does reasonable doubt exist where a defendant has a history of mental health issues and use of psychoactive medications, been deprived of an unknown medication during trial, and becomes debilitated during trial? Second, is a trial court required to consider evidence of incompetence adduced during pretrial proceedings in its reasonable doubt determination if a different judge adjudicated pretrial matters? Third, is it permissible to remedy a violation of a

COURT OF APPEALS
OF
NEVADA

(O) 1947B

defendant's right to a competency hearing by remanding the case to the trial court to determine whether the defendant was incompetent during trial?

We now extend Nevada's procedural due process requirement of a hearing to determine competency to novel factual circumstances and apply a new remedy. Accordingly, we conclude that (1) reasonable doubt exists as to a defendant's competency where the defendant has a history of mental health issues and psychoactive medication use, is deprived of medication during trial, and becomes debilitated thereafter; (2) a trial court must consider any evidence of incompetence in the record when determining whether reasonable doubt exists notwithstanding whether the case is transferred from another judge; and (3) we may remedy a violation of a defendant's right to a competency hearing by remanding the case to the trial court to determine whether the defendant was incompetent during trial, but the trial court must first determine if the competency hearing is feasible before holding it.

## FACTS AND PROCEDURAL HISTORY

Appellant Ralph Edmond Goad and Theodore Gibson lived in apartments located in the same hallway of an apartment building in Reno. Goad and Gibson were apparently close friends and frequently spent time together. Both Goad and Gibson were in their seventies and received Social Security benefits through a payee counseling service that managed income from Social Security on behalf of beneficiaries who were unable to manage their own finances. Near the end of 2018, the payee service closed. Goad received his last payment from the payee service in November 2018. On January 11, 2019, Goad received a notice of eviction for nonpayment of rent. He was locked out of his apartment on January 30.

On February 13, employees of the apartment building found Gibson's dead body in his apartment. According to the autopsy report,

Gibson suffered a total of 250 stab wounds to the face, head, neck, and other parts of his body. Inside the apartment, police found Gibson's wallet on the floor with its contents strewn about and containing no cash. Police recovered scissors and a knife from inside Gibson's apartment with Gibson's blood on them. Police found Goad's DNA on the handle of the scissors. Police later recovered Goad's clothes from his apartment, on which police detected Gibson's blood. Police obtained video surveillance footage of the hallway in which Gibson's and Goad's apartments were located. The footage shows Gibson entering his apartment on January 18, which was the last time Gibson was seen alive, and Goad entering and exiting Gibson's apartment multiple times between January 18 and January 22. Goad was arrested in Sacramento on March 7.

The State charged Goad with murder with the use of a deadly weapon. The State moved to admit evidence of Goad's finances, including documents regarding his eviction. Goad opposed the motion. In its reply, the State included a transcript of the police interrogation of Goad following his arrest. During the interrogation, Goad discussed his finances and recounted his mental health history, including mental health hospitalizations, doctors struggling to diagnose his mental conditions, and psychoactive medications that he had been prescribed to stabilize his conditions. Among other things, Goad stated,

> they said [I was in the mental hospital] because depression. . . . But, um, the nurses would tell ya you got something else. They'd tell the doctor to write that down. . . . Some years they'd say it was this and give me these pills. . . . And some years they'd say it was that and give me those pills. The only thing that really worked was Amitriptyline for sleep. And, uh, 1 milligram of Ativan three times a

day to stop the shakes[, which are from] this and that. See, I've been a nervous wreck all my life.

. . .

No, I'm definitely not fine. . . . I don't know [what's wrong,] I just don't get along like, um, I'm different. . . . [I just don't get along with people] because I can't sleep right and I'm nervous all the time.

. . .

[I take] Amitriptyline and the Ativan. The Amitriptyline is for depression and sleep. And the Ativan is for bad nervous, anxiety. It's much better than Valium. Valium just makes you sleepy. Ativan calms you down like that.

. . .

[The last time I took my medications was] 7 years ago, 'cause when they took me out of the mental hospital and gave me that payee, she was independent, so I wasn't allowed to go back and see a doctor or get medicine anymore. So it was good in a way. But I wasn't able to get any medication anymore. So 7 years, I went without medicine.

. . .

[When I'm not on medication, I] get angry [and] have to drink beer to calm down. . . . [When] the beer wears off, it makes you angry 'cause now I gotta walk to the store and buy more beer to calm down again.

In this case, one judge presided over all pretrial matters, and the case was transferred to another judge for trial. The trial judge acknowledged during trial that he was not entirely familiar with what

occurred pretrial by stating, "I did not conduct the pretrial hearings," and "I reflected on the fact that I don't know everything that was argued in front of" the pretrial judge.

On the first day of trial, during jury selection but outside the presence of the prospective jurors, the court, defense counsel, and the State briefly discussed Goad's mental health and whether the State would seek admission of the transcript of the police interrogation of Goad. The State informed the court that it would not seek to introduce the transcript at trial. The parties discussed the interrogation transcript again after opening statements because defense counsel quoted a line from the transcript in his opening statement but could not provide a viable theory for admission of the transcript at trial.

At around 2 p.m. on the third day of Goad's trial, the district court and counsel discussed Goad's condition and demeanor outside the presence of the jury. The court explained that "there had been some inquiries about Mr. Goad's health." Court staff informed the court that, according to medical staff at the jail, Goad had not received his medication that morning and that it was "the type that cannot wait [to be administered] until the end of" the day. Therefore, Goad needed to be transported immediately to the sheriff's office in order to receive the medication. The district court and the parties did not discuss the name or effects of the medication Goad was deprived of on the third day of trial.

After staff came forward, the court solicited comments from the State and defense counsel on the matter. Both informed the court that Goad appeared infirm that morning and that his condition worsened as the day progressed. Defense counsel reported that Goad had been "degrading in his physical [condition]." The State reported that, when Goad came into the

 

courtroom on the morning of the third day of trial, "he did not sit down, he stood there with a look that I think was objectively concerning to the [S]tate."

The district court expressed that it had also observed a change in Goad's demeanor. The court stated, "I've watched Mr. Goad a little bit more today, hoping that he doesn't fall out. I do not believe there is any gamesmanship, legal strategy, being pursued at all." The court added, "Mr. Goad is entitled to be present and well as he both observes trial and participates with his attorneys privately." The court then recessed for the day in order for Goad to be transported to receive his medication.

On the morning of the fourth day of trial, defense counsel asked the district court to canvass Goad because Goad refused to interact with or even acknowledge defense counsel that morning. The court replied that it was "not going to conduct some form of informal mini[-]mental examination from the bench" and that the trial would "proceed with or without Mr. Goad's presence or participation." Nevertheless, the court began asking Goad questions, and Goad gestured to inform the court that he was unable to speak. The court thereafter reported Goad's gestures for the record, including Goad's nods affirming that he was aware of what the judge does, who his attorneys were, and that he desired to proceed with trial. The court's questions did not specifically address the factors for determining incompetence set forth in NRS 178.400(2).[1] Court staff informed the court

---

[1]See NRS 178.400(2) ("'[I]ncompetent' means that the person does not have present ability to (a) [u]nderstand the nature of the criminal charges against the person; (b) [u]nderstand the nature and purpose of the court proceedings; or (c) [a]id and assist the person's counsel in the defense at any time during the proceedings with a reasonable degree of rational understanding.").

that the infirmary at the jail had medically cleared Goad for trial. The district court then resumed trial.

Later, the court asked Goad's counsel to comment on his condition. Defense counsel stated, "it's as if the medication that he was given yesterday has a time frame in which it actually has its effect. Because I have noticed a marked difference now with respect to Mr. Goad and his ability to communicate with me." Counsel continued, "[i]t's as if . . . this morning [the medication] hadn't fully activated."

The jury ultimately found Goad guilty of murder with the use of a deadly weapon. The district court later sentenced Goad to life in prison without the possibility of parole and a consecutive sentence of 36 to 240 months for the use of a deadly weapon.[2] This appeal followed.

On appeal, Goad argues that the district court (1) violated his federal due process and Nevada constitutional rights by failing to order a competency hearing, (2) abused its discretion by admitting evidence of his financial situation,[3] and (3) abused its discretion by admitting photos of

---

[2]This court only reviews the record that was before the district court on the third and fourth days of trial, when Goad endured the effects of missing his medication. However, the dissent asserts "Goad has never been found legally incompetent" based on comments from Goad's sentencing hearing and oral argument before this court, which were not in the record before the district court on the third and fourth days of trial. Even so, at sentencing, the court commented Goad was the subject of "five separate proceedings in which somebody sought to have him involuntarily committed because of mental health concerns that he may be a harm to himself or others."

[3]The district court admitted the evidence of Goad's finances and eviction as res gestae evidence under NRS 48.035(3), but denied the State's motion as to its alternative theory that the evidence consisted of prior bad acts that qualified under the motive exception in NRS 48.045(2). However,

Gibson's clothing that he was wearing when he was killed.[4] We conclude the district denied Goad due process by failing to conduct a competency hearing when reasonable doubt arose about Goad's competency. Accordingly, we vacate Goad's judgment of conviction and remand for appropriate hearings.[5]

## ANALYSIS

Goad argues that the district court denied him due process under the United States and Nevada Constitutions when it failed to order

---

on appeal, Goad argues that the district court admitted this evidence under the motive exception to the rule prohibiting prior bad act evidence; that is, Goad does not challenge the admission of the evidence under NRS 48.035(3). Thus, Goad waived any alleged error. *See Old Aztec Mine, Inc. v. Brown*, 97 Nev. 49, 52, 623 P.2d 981, 983 (1981) (stating that, by failing to raise an argument on appeal, a party thereby waives the argument); *see also Maresca v. State*, 103 Nev. 669, 673, 748 P.2d 3, 6 (1987) (explaining that this court need not consider an appellant's argument that is not cogently argued or lacks the support of relevant authority).

[4]Goad moved to preclude admission of photographs of Gibson's blood-soaked clothes with holes corresponding to his stab wounds, arguing the photos were substantially more unfairly prejudicial than probative because they were gruesome. The district court ruled the photographs were admissible because they assisted the State's forensic pathologist with her testimony and were not unfairly prejudicial. We conclude that there was no abuse of discretion because the photographs of the blood-soaked clothes were not substantially more unfairly prejudicial than probative, and they assisted the State's pathologist to testify as to the stab wounds. *See Browne v. State*, 113 Nev. 305, 314, 933 P.2d 187, 192 (1997); *cf. Harris v. State*, 134 Nev. 877, 880, 432 P.3d 207, 211 (2018) (holding photographs of a crash scene were prejudicial because they showed mutilated bodies in the aftermath of a crash scene), *cert. denied*, 587 U.S. ___, 139 S. Ct. 2671 (2019).

[5]We do not reach Goad's claim of cumulative error in light of our disposition.

a competency hearing. He contends reasonable doubt about his competency arose because he was deprived of a necessary medication, refused to interact with defense counsel, and was unable to speak. Goad emphasizes that defense counsel, the State, and the district court agreed that he was unable to be present on the afternoon of the third day of trial due to his declining condition. Goad further argues that the court's canvass of Goad on the fourth day of trial did not dispel the reasonable doubt, especially because the court failed to ask Goad why he could not speak or why he refused to interact with his counsel.

The State argues that a competency hearing was unnecessary. The State claims that the canvass the district court performed at the request of defense counsel, Goad's comprehension of the canvass, Goad's desire to proceed with the trial, that the infirmary medically cleared Goad on the morning of the fourth day of trial, and Goad's ability to write in lieu of speaking all dispelled any doubt. The State further argues that the Nevada Supreme Court rejected a due process claim analogous to Goad's in *Lipsitz v. State*, 135 Nev. 131, 442 P.3d 138 (2019). We disagree with the State.

We first address the due process requirement for a competency hearing, its relationship to Nevada's competency statutes, and evaluate the district court's compliance with each. We then conclude that a retrospective competency hearing is an acceptable remedy for denial of a defendant's right to a competency hearing, and further adopt a test for determining whether a retrospective competency hearing is feasible and may proceed in lieu of reversal and a new trial.

*Due process*

Federal due process jurisprudence and Nevada law govern Goad's claim that the district court violated his right to procedural due

process by failing to order a competency hearing. *See Melchor-Gloria v. State*, 99 Nev. 174, 180, 660 P.2d 109, 113 (1983); Nev. Const. art. 1, § 8. A district court's determination of whether a competency hearing is required is reviewed for abuse of discretion. *Olivares v. State*, 124 Nev. 1142, 1148, 195 P.3d 864, 868 (2008). A district court abuses its discretion and denies due process when reasonable doubt as to the defendant's competency arises and it fails to order a competency hearing. *Id.*

"The Due Process Clause of the Fourteenth Amendment provides that a criminal defendant may not be prosecuted if he or she lacks competence to stand trial." *Lipsitz*, 135 Nev. at 135, 442 P.3d at 142. A defendant is competent if he "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and [if] he has a rational as well as factual understanding of the proceedings against him." *Melchor-Gloria*, 99 Nev. at 179-80, 660 P.2d at 113 (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960) (internal quotations omitted)); *see also* NRS 178.400(2); *Odle v. Woodford*, 238 F.3d 1084, 1089 (9th Cir. 2001) ("[C]ompetence to stand trial does not consist merely of passively observing the proceedings. Rather, it requires the mental acuity to see, hear[,] and digest the evidence, and the ability to communicate with counsel in helping prepare an effective defense."). There are two "due process rights related to competency to stand trial. The first is the traditional right not to be tried or convicted while legally incompetent. The second . . . is the right to be accorded a competency hearing when sufficient evidence of incompetency is adduced before the trial court." *Doggett v. Warden*, 93 Nev. 591, 595, 572 P.2d 207, 210 (1977) (citations omitted). This appeal primarily concerns the latter.

Nevada statutory law prescribes a procedure that trial courts must follow in order to determine whether doubt as to a defendant's competency amounts to reasonable doubt necessitating a competency hearing. *See* NRS 178.405(1) (providing that a court must suspend the proceedings when doubt arises until the question of competency is determined); NRS 178.415 (prescribing the procedures a court must follow in conducting a competency hearing). "Under Nevada's competency procedure, if *any* 'doubt arises as to the competence of the defendant, the court shall suspend the . . . [trial] until the question of competence is determined.'" *Scarbo v. Eighth Judicial Dist. Court*, 125 Nev. 118, 121-22, 206 P.3d 975, 977 (2009) (quoting NRS 178.405(1)) (emphasis added). During the suspension, the court must "hold a hearing to fully consider [such] doubts and to determine whether further competency proceedings under NRS 178.415 are warranted." *Olivares*, 124 Nev. at 1149, 195 P.3d at 869. "Further competency proceedings under NRS 178.415 are warranted when there is reasonable doubt regarding a defendant's competency." *Scarbo*, 125 Nev. at 121-22, 206 P.3d at 977 (internal quotations omitted).

*Nevada's competency statutes*

It is unclear whether the district court was attempting to comply with NRS 178.405(1) on the third day when it paused the proceedings, solicited comments about Goad's behavior, and ultimately recessed for the day. However, due process requires us to find error where a defendant did not receive a competency hearing if reasonable doubt existed as to his competency, regardless of whether the district court complied with NRS 178.405(1). Nevertheless, we note that NRS 178.405 and NRS 178.415 prescribe a framework for compliance with the due

process reasonable doubt standard that trial courts are required to follow.[6] Unequivocal and diligent adherence to these statutes will naturally guide district courts to a reliable determination of whether a formal competency hearing is necessary and, ultimately, whether the defendant is incompetent.[7] *See Olivares*, 124 Nev. at 1149, 195 P.3d at 869 ("In addition to the doubts that have been raised, the district court may consider all available information, including any prior competency reports and any new information calling the defendant's competency into question.").

---

[6]*See, e.g., Humphreys v. State*, Docket No. 52525, at *4 (Order of Affirmance, Nov. 25, 2009) ("Nevada's governing statutes, as interpreted by this court, set up a two-stage procedure that the district court must follow whenever the question of a defendant's competency has been raised: First, the district court must evaluate if there is any doubt as to the defendant's competency. If there is, the court must suspend the proceedings and hold a hearing to consider fully the doubts. Second, if as a result of considering fully those doubts, the district court finds there is reasonable doubt regarding a defendant's competency, the district court must order a full competency evaluation pursuant to the provisions of NRS 178.415." (citations omitted)).

[7]The dissent does not discuss NRS 178.405 or NRS 178.415, but asserts our decision encourages "fishing expeditions" in which we "imagine" evidence will surface. The dissent's comments belie the prescriptions of NRS 178.415, which specifically invite new evidence for the purpose of determining competency. NRS 178.415 requires a district court to appoint two psychologists or psychiatrists, or one of each, to "examine" the defendant, and the court must receive their "report of the examination." NRS 178.415(1), (2). Both the prosecution and the defendant may "introduce other evidence including, without limitation, evidence related to treatment to competency and the possibility of ordering the involuntary administration of medication . . . ." NRS 178.415(3).

*Procedural due process*

We now turn to whether Goad was entitled to a competency hearing as a matter of procedural due process.[8] In Nevada, "[a] formal competency hearing is constitutionally compelled any time there is 'substantial evidence' that the defendant may be mentally incompetent to stand trial. In this context, evidence is 'substantial' if it 'raises a reasonable doubt about the defendant's competency to stand trial.'" *Melchor-Gloria*, 99 Nev. at 180, 660 P.2d at 113 (quoting *Moore v. United States*, 464 F.2d 663, 666 (9th Cir. 1972)). "The trial court's sole function in such circumstances is to decide whether there is any evidence which, assuming its truth, raises a reasonable doubt about the defendant's competency."[9] *Id.* A court must

---

[8]The State correctly acknowledged during oral argument before this court that if Goad was incompetent at any point during trial, he was denied substantive due process. However, Goad argues on appeal that he was denied procedural due process insofar as he did not receive a hearing to determine his competency, not that he was incompetent in fact and denied his substantive due process right not to stand trial while incompetent. As Goad stated during oral argument, the procedural due process right to a hearing to determine competency—which protects and ensures the substantive right not to stand trial while incompetent—has been treated *like* it is structural. The Nevada Supreme Court has historically remedied a district court's failure to provide a competency hearing when reasonable doubt arose by reversing and remanding for a new trial, but it has not ruled that such error is structural. *See, e.g.*, *Olivares*, 124 Nev. at 1149, 195 P.3d at 869; *Fergusen v. State*, 124 Nev. 795, 806, 192 P.3d 712, 720 (2008); *Williams v. Warden*, 91 Nev. 16, 17, 530 P.2d 761, 761-62 (1975); *Krause v. Fogliani*, 82 Nev. 459, 463, 421 P.2d 949, 951 (1966).

[9]The dissent misapplies *Melchor-Gloria* to argue reasonable doubt about competency is solely a question of fact that is entirely "within the discretion of the trial court." The very next line in *Melchor-Gloria* states, "[t]he court's discretion in this area, however, is not unbridled." 99 Nev. at 180, 660 P.2d at 113. Indeed, in the ensuing paragraph, *Melchor-Gloria* sets forth two jointly sufficient criteria for finding abuse of discretion and

consider evidence of incompetence in the aggregate, rather than separately or in isolation. *Drope v. Missouri*, 420 U.S. 162, 179-80 (1975). "Once there is such evidence from any source, there is a doubt that cannot be dispelled by resort to conflicting evidence," *Melchor-Gloria*, 99 Nev. at 180, 660 P.2d at 113 (quoting *Moore*, 464 F.2d at 666), and the court must, "sua sponte, . . . order a competency hearing," *Krause*, 82 Nev. at 463, 421 P.2d at 951. "If [evidence raising a reasonable doubt] exists, the failure of the court to order a formal competency hearing is an abuse of discretion and a denial of due process."[10] *Melchor-Gloria*, 99 Nev. at 180, 660 P.2d at 113

violation of due process: evidence giving rise to a reasonable doubt about competency, and failure to order a competency hearing. Reasonable doubt is *not evaluated* for abuse of discretion; rather, it is a criterion for *finding* an abuse of discretion. The dissent thus inverts the abuse of discretion standard as it pertains to the reasonable doubt (puts the cart before the horse). We do not evaluate whether reasonable doubt existed for abuse of discretion; according to *Melchor-Gloria*, we find abuse of discretion where reasonable doubt existed and the district court failed to order a competency hearing. Since both criterion are present here, we must find an abuse of discretion in this case.

[10]The dissent asserts *Melchor-Gloria* states "three things courts must weigh to determine whether a full competency hearing is required—the defendant's history of irrational behavior, his demeanor at trial, and [any] prior medical opinion of his competence to stand trial . . . ." *Melchor-Gloria* states this information in a parenthetical citing to *Drope*, 420 U.S. at 180. However, *Drope* states that these factors "are all relevant in determining whether further inquiry is required, but that even one of these factors standing alone may, in some cases, be sufficient." *Id.* *Drope* also notes that there are no "fixed or immutable" factors for the trial court to address because "the inquiry is often a difficult one in which a wide range of manifestations and subtle nuances are implicated." *Id.* Thus, the dissent mischaracterizes *Melchor-Gloria* as positing an exclusive list of sources from which a district court may infer reasonable doubt. *Drope* shows that these are potential sources used to assess doubt as to competency, not exclusive factors.

(citing *Pate v. Robinson*, 383 U.S. 375, 385 (1966)). A defendant cannot waive his right to a competency hearing and, accordingly, does not waive his right to a competency hearing by failing to request one. *Krause*, 82 Nev. at 463, 421 P.2d at 951; *see also Pate*, 383 U.S. at 384.

*Moore*, the United States Court of Appeals for the Ninth Circuit opinion from which *Melchor-Gloria* adopted its language regarding reasonable doubt, dictates that an appellate court reviews a district court's reasonable doubt determination (or lack thereof) based on the evidence "before the court" at the time when reasonable doubt purportedly arose. 464 F.2d at 666. Federal precedent further indicates that any evidence in the record is properly "before the [trial] court" at any given time. *See United States v. Brugnara*, 856 F.3d 1198, 1215 (9th Cir. 2017) ("Such reasonable [doubt] exists when there is substantial evidence in the record . . . ." (internal quotations omitted)); *Hernandez v. Ylst*, 930 F.2d 714, 718 (9th Cir. 1991) (finding that a court's pretrial determination of doubt properly excluded a psychological report that was not in the record at the time the determination was made); *United States v. Veatch*, 674 F.2d 1217, 1223 (9th Cir. 1981) (stating that the court reviewed "the entire record that was before the district court" to determine whether reasonable doubt existed). Thus, when read in light of *Moore*, *Melchor-Gloria*'s broad requirement that a district court must consider "whether there is any evidence" "from any source" in its reasonable doubt determination extends to evidence of incompetence in the record corresponding to the defendant's case, including evidence adduced pretrial or before a different judge. 99 Nev. at 180, 660 P.2d at 113; *Moore*, 464 F.2d at 666.

*Reasonable doubt*

The foregoing authority compels us to conclude that the district court denied Goad due process because reasonable doubt existed on the third and fourth days of trial and the court did not hold a competency hearing. Pursuant to *Moore* and *Melchor-Gloria*, the district court was required to consider any evidence of incompetence in the record to conclude there was no reasonable doubt.[11] *Moore*, 464 F.2d at 666; *Melchor-Gloria*, 99 Nev. at 180, 660 P.2d at 113. For example, the interrogation transcript was among the evidence before the district court; i.e., in the record, on the third and fourth days of trial. Thus, the court was required to consider any information in the transcript pertinent to Goad's competency in its reasonable doubt determination, including Goad's possible history of mental health hospitalizations, the fact that doctors struggled to diagnose him, and his past use of various psychoactive medications.

We understand that, as a practical matter, district courts do not typically scrutinize every item in the record of every case. However, the Nevada Supreme Court has not limited the scope of the evidence that *Melchor-Gloria* requires a district court to consider. At a minimum, *Melchor-Gloria* requires a district court to consider evidence in the record,

___

[11]The district court never stated on the record that a reasonable doubt did or did not exist as to Goad's competency; however, a trial court impliedly determines there is no reasonable doubt as to a defendant's competency if it fails to exercise its sua sponte duty to order a competency hearing. *See Drope*, 420 U.S. at 181 ("[A] trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standard of competence to stand trial."); *Moore*, 464 F.2d at 666 ("At any time . . . evidence [raising a reasonable doubt as to defendant's competency] appears, the trial court *sua sponte* must order an evidentiary hearing on the competency issue."); *Fergusen*, 124 Nev. at 802, 192 P.3d at 717; *Krause*, 82 Nev. at 463, 421 P.2d at 951.

given that *Moore*, the case from which the supreme court adopted the standard announced in *Melchor-Gloria*, specifies that the record is among the sources of evidence a district court must consider. Yet, the district court must also consider the defendant's behavior at trial, which may not be reflected in the record. *See Drope*, 420 U.S. at 180 ("[E]vidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required . . . ."). Thus, the burden of holding district courts to account for evidence of incompetence in the record is neither novel nor exhaustive of a district court's duty to ensure a defendant is competent during trial.

Additionally, the burden established by the Nevada Supreme Court in *Melchor-Gloria* is apt given that it ultimately serves to protect the right to be competent while one stands trial. The right to a hearing to determine competency safeguards the substantive due process right not to stand trial while incompetent, which is

> rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel, the rights to summon, confront, and to cross-examine witnesses, and the right to testify on one's own behalf or remain silent without penalty for doing so.

*Riggins v. Nevada*, 504 U.S. 127, 139-40 (1992) (Kennedy, J., concurring). If we allow a district court to overlook portions of the record, we risk curtailing the evidence of incompetence that will come to the court's attention. *See Fergusen*, 124 Nev. at 802, 192 P.3d at 718 (stating that a district court may not assign the determination of whether a defendant is competent to a different judge during trial because doing so would interrupt

the trial judge's ongoing assessment of the defendant's competence). This would decrease the likelihood that a court will find reasonable doubt exists as to the defendant's competency, and the right to a competency hearing would become dependent upon the trial court's diligence in reviewing the record. This is particularly so in cases where the defendant's behavior during trial could seem negligible in isolation, but when considered in light of evidence in the record that was submitted pretrial, the doubtfulness as to competency may become palpable.

The evidence of Goad's incompetence that was properly before the district court gave rise to a reasonable doubt in the aggregate. As stated, the district court was required to consider any evidence of incompetence in the record and its own observations in light of other evidence or observations bearing on Goad's competence in reaching its reasonable doubt determination. *See Drope*, 420 U.S. at 179-80. In the aggregate, the crime of which Goad was accused—stabbing his elderly friend 250 times and repeatedly visiting the victim's apartment following the victim's death;[12] Goad's apparent history of mental health issues and

---

[12]Although the extreme nature of the stabbings of which Goad was accused and his returns to the crime scene do not prove that he was incompetent at trial, the fact that he apparently engaged in such irrational behavior is a factor a district court must weigh in determining whether reasonable doubt exists. *See Drope*, 420 U.S. at 179 (stating that the trial court failed to give proper weight to record evidence, including the victim's testimony that the defendant allegedly attempted to choke her to death on the Sunday prior to trial); *id.* (stating that the trial court may not ignore "the uncontradicted testimony of a history of pronounced irrational behavior"); *Doggett*, 93 Nev. at 595, 572 P.2d at 209 (citing *Pate*, 383 U.S. 375) (stating that the Supreme Court held in *Pate v. Robinson* that there was a reasonable doubt about Pate's competency in part due to "uncontradicted testimony of defendant's long history of disturbed and

COURT OF APPEALS
OF
NEVADA

(O) 1947B

psychoactive medication use; the fact that Goad was deprived of medication on the third day of trial; and the fact that Goad became debilitated on the third day of trial—which was corroborated by defense counsel, the State, and the district court—collectively suggested that Goad was deprived of a medication that stabilized his mental health, was suffering from withdrawals, or was somehow adversely affected by not having taken the medication. Thus, the evidence of Goad's incompetence gave rise to a reasonable doubt as to whether Goad was competent on the third day of trial.[13] *See Melchor-Gloria*, 99 Nev. at 179-80, 660 P.2d at 113; *see also* NRS

---

violent episodes, including the slaying of his infant son and an attempted suicide").

[13]The dissent states that, by "aggregating," we mean that a district court must "conduct a full-blown hearing and investigation." Indeed, "that's not how the legal test works[.]" However, this is not how we applied the aggregating principle. The aggregating principle requires a trial court to consider evidence of potential incompetence in light of other such evidence rather than in isolation when determining reasonable doubt. *See Chavez v. United States*, 656 F.2d 512, 517-18 (9th Cir. 1981). In isolation, being deprived of medication does not imply that the medication could affect Goad's competency; the medication conceivably could have treated a purely physical ailment that does not impact competency. Applying the aggregating principle, it becomes more likely that the deprivation of medication affected his competency because the district court must consider the deprivation in light of other evidence, including Goad's behavior, the court's worry that Goad "might fall out," that Goad has historically relied on psychoactive medication to stabilize his mental health, and the urgency with which staff had to administer Goad's medication. *See* 40 Am. Jur. 2d *Proof of Facts* 171, § 10 cmt. (2021 Update) ("It would seem prudent to require a competency hearing any time a defendant is taking medication or drugs which may have an effect on his mental capabilities. This would protect the defendant's interests and also save the state considerable time and expense by obviating the situation in which a lengthy trial would be nullified due to a subsequent determination that the defendant was legally incompetent to stand trial.").

178.400(2); *People v. Moore*, 946 N.E.2d 442, 448 (Ill. App. Ct. 2011) (providing that a "bona fide doubt" arose when the "chemically-dependent" defendant, who needed antidepressants to be fit for trial, was "suddenly made to go off his medication," and that the trial court could not shirk its sua sponte duty to order a competency hearing by placing the burden on defense counsel to inquire into the matter).

Goad's competency only became more doubtful on the fourth day of trial when he inexplicably lost his ability to speak and refused to acknowledge his counsel despite never refusing to do so before. Thus, the evidence of Goad's potential incompetence in the record, in the aggregate, raised a reasonable doubt as to Goad's competence on the third and fourth days of trial.

The evidence the State cites to contradict the reasonable doubt that arose during trial did not dispose of the court's duty to order a competency hearing. A reasonable doubt cannot be dispelled by resorting to conflicting evidence once there is evidence of incompetence sufficient to give rise to a reasonable doubt. *Melchor-Gloria*, 99 Nev. at 180, 660 P.2d at 113. Therefore, the evidence that the State cites to suggest that Goad was competent, including that Goad was apparently medically cleared on the fourth day of trial by an unknown person from the jail staff and Goad's comprehension and nonverbal responsiveness during the court's canvass, did not obviate the need for a competency hearing.[14] *See Pate*, 383 U.S. at 385 (rejecting the argument that "the mental alertness and understanding displayed in [the defendant's] colloquies with the trial judge" dispensed with the need for a competency hearing (internal quotations omitted)).

---

[14]Additionally, the district court's canvass did not cover the criteria for incompetency as provided by NRS 178.400(2).

Neither Goad's expressed desire to proceed nor defense counsel's request for a canvass waived Goad's right to a competency hearing. A defendant cannot waive his right to a competency hearing. *Krause*, 82 Nev. at 463, 421 P.2d at 951 (citing *Pate*, 383 U.S. at 384). Goad did not waive his right to a competency hearing by not specifically requesting one either. *See Pate*, 383 U.S. at 384 (rejecting the prosecution's argument that the defendant waived his right to a competency hearing because his counsel failed to demand a hearing). Thus, the State's argument that the district court satisfied due process by obliging defense counsel's request for a canvass and by confirming that Goad desired to proceed is unpersuasive.[15]

The State's analogy to *Lipsitz* overlooks that there are stronger indicia of incompetence in Goad's case. In *Lipsitz*, the Nevada Supreme Court held that a trial court did not err when it "relied on defense counsel's assurances, its own interactions with [the defendant], and his responses to

---

[15]The dissent cites no authority for its conclusion that, "[i]f Goad can't quite bring himself to say that he was incompetent in truth and in fact, then I would conclude that there exists no 'reasonable doubt[.]'" This is a classic "red herring" because Goad was not required at trial, or now on appeal, to assert he was incompetent. The quantum of proof for a defendant to be entitled to a competency hearing is reasonable doubt. *Melchor-Gloria*, 99 Nev. at 180, 660 P.2d at 113. Due process required he receive a hearing when there was reasonable doubt as to his competency, and the hearing was not conditioned upon Goad or his counsel asserting that he was incompetent in fact. Thus, even if he ultimately would have been found competent at trial, he was still entitled to a hearing under NRS 178.415 to *confirm* he was competent because there was a reasonable doubt. Additionally, NRS 178.415 shows competency in fact is a question requiring medical expertise: a court may determine competency in fact only after receiving reports from experts. We cannot expect Goad to declare in good faith that he was incompetent when we would not allow a district court to reach the same conclusion without the assistance of experts.

the court's canvass in arriving at its determination that a competency hearing was not warranted." 135 Nev. at 135, 442 P.3d at 142. The supreme court concluded that the defendant's obstinacy was not sufficient to raise a reasonable doubt as to the defendant's competence. *Id.* at 135, 442 P.3d at 142-43.

The State is correct that, like the district court in *Lipsitz*, the district court here performed a canvass—albeit a brief one—and relied in part on assurances from counsel that Goad desired to proceed with trial. Similarly, Goad appeared to behave "obstinately" on the morning of the fourth day of trial when he refused to acknowledge his counsel. However, unlike Goad, who was deprived of medication and whose psychiatric and medical history suggested that the deprivation of the medication affected his competency, there was no reason to believe that Lipsitz had been deprived of medication that affected his competency.

Furthermore, Lipsitz's obstinacy was preceded by a pattern of attempts to obstruct trial proceedings. *Id.* at 132-34, 442 P.3d at 141-42. Comparatively, there is no indication in the record that Goad behaved inappropriately, previously refused to acknowledge defense counsel, or otherwise obstructed the proceedings prior to the fourth day of trial. On the contrary, Goad's obstinacy on the fourth day of trial weighs in favor of finding that reasonable doubt existed because, according to the district court, he was well-behaved throughout trial. Based on the record, Goad's temperament changed only after he was deprived of medication. *See Drope*, 420 U.S. at 181 ("Even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial."); *see generally Hawai'i*

*v. Soares*, 916 P.2d 1233, 1250 (Haw. Ct. App. 1996), *overruled on other grounds by State v. Janto*, 986 P.2d 306 (Haw. 1999).[16]

In sum, federal due process jurisprudence and the Nevada Constitution required the district court to order a competency hearing sua sponte because reasonable doubt arose as to Goad's competency on the third day of trial in light of the nature of the charged crime, Goad's history of mental health conditions and use of psychoactive medications, Goad being deprived of medication, and Goad's abnormal behavior thereafter. The reasonable doubt that accrued on the third day of trial continued into the fourth day of trial, where Goad's competency became even more doubtful in light of his inability to speak and his refusal to acknowledge his counsel. We emphasize that the record does not suggest that Goad was feigning his behavior or attempting to manipulate the court at any time.

Although we conclude there was sufficient evidence to give rise to a reasonable doubt, our conclusion should not be interpreted as endorsing or opposing an inference that Goad was in fact incompetent during trial.

---

[16]Although Nevada competency jurisprudence has not previously addressed the significance of deprivation of medication with regard to a court's reasonable doubt determination, Goad's case is very similar to *Soares*. 916 P.2d at 1250. In *Soares*, the Intermediate Court of Appeals of Hawai'i held that "a good faith doubt"—Hawai'i's rendition of the "reasonable doubt" standard—arose based upon the defendant's assertion that he had not received his medication that morning and his trial counsel's representation that he "was acting completely differently from the first day of trial." *Id.* The court explained that it was "not clear from the record whether [d]efendant required the medication in order to be mentally competent to proceed to trial. However, in view of [d]efendant's assertion, as well as his trial counsel's representations that [d]efendant was acting completely differently from the first day of trial[,] . . . a good faith doubt was clearly raised as to whether [d]efendant's failure to take his medication was directly affecting his legal competence to stand trial." *Id.*

We reiterate that the district court was required to "decide whether there is any evidence which, *assuming its truth*, raise[d] a reasonable doubt" about Goad's competency. *See Melchor-Gloria*, 99 Nev. at 180, 660 P.2d at 113 (emphasis added) (quoting *Moore*, 464 F.2d at 666). We thus do not resolve whether Goad was telling the truth when he made the statements documented in the interrogation transcript, whether the medication did in fact impact his competency, or any other matter bearing on Goad's competency except to the extent that it gave rise to a reasonable doubt necessitating a competency hearing.

*Remedy*

In every case where the Nevada Supreme Court has found on direct review that a trial court failed to order a competency hearing when reasonable doubt existed, it has reversed the judgment of conviction and ordered a new trial.[17] When the case entailed review of a petition for a writ of habeas corpus, the court discharged the petitioner from confinement unless the State elected to retry the petitioner within a reasonable time.[18] Despite this uniformity, the Nevada Supreme Court has not ruled that reversal and remand for a new trial is *always* required when a trial court

---

[17]*See Olivares*, 124 Nev. at 1149, 195 P.3d at 869 (reversing defendant's conviction and remanding the case to district court to conduct a new trial); *Fergusen*, 124 Nev. at 806, 192 P.3d at 720 (reversing the defendant's conviction and remanding the case for a new trial).

[18]*See Williams*, 91 Nev. at 17, 530 P.2d at 761-62 (reversing a habeas petitioner's conviction because the trial court failed to order a competency hearing and "discharg[ing] [petitioner] from confinement unless the State within a reasonable time elects to retry him"); *Krause*, 82 Nev. at 463, 421 P.2d at 951 (discharging a habeas petitioner from confinement due to a trial court's failure to sua sponte order a competency hearing "unless the State, within a reasonable time, elects to retry him").

fails to order a competency hearing. *See Krause*, 82 Nev. at 463, 421 P.2d at 951 (stating that the court "prefer[s]" the United States Supreme Court's remedy in *Pate* of reversal and remand due to the difficulty of holding a limited retrospective hearing). Nor has the United States Supreme Court ruled that reversal and remand is the exclusive remedy when a court violates *Pate*. *See Pate*, 383 U.S. at 386; *Drope*, 420 U.S. at 183.

In lieu of reversal and remand, appellate courts have at times remedied trial courts' failures to order a competency hearing with a retrospective, or *nunc pro tunc*, competency hearing. *See Odle*, 238 F.3d at 1089-90 ("The state court can nonetheless cure its failure to hold a competency hearing at the time of trial by conducting one retroactively."). A *nunc pro tunc* hearing is a hearing that takes the place of a contemporaneous hearing, as if it had been held at an earlier time. *See Iouri v. Ashcroft*, 464 F.3d 172, 181-82 (2d Cir. 2006), *opinion modified and superseded on denial of rehearing*, 487 F.3d 76 (2d Cir. 2007).

The utility of a retrospective competency hearing is clear: "[a]n automatic full reversal with a remand for a new trial . . . would impose severe costs on the justice system in remedying a violation that, while considered a miscarriage of justice in the context of competency proceedings, might not have affected the guilt and penalty verdicts." *People v. Lightsey*, 279 P.3d 1072, 1102 (Cal. 2012). "[I]f placing [the] defendant in a position comparable to the one he would have been in had the violation not occurred is possible," and the district court finds that the defendant was competent to stand trial on remand, then "we would have no reason to

question the fundamental fairness and reliability of the remainder of the judgment against him." *Id.*

However, before a *nunc pro tunc* competency hearing can occur, the district court must determine on remand that a meaningful retrospective hearing to determine competency is feasible.[19] *See Odle*, 238 F.3d at 1089-90; *see also McGregor v. Gibson*, 248 F.3d 946, 962 (10th Cir. 2001) ("Retrospective competency hearings are generally disfavored but are permissible whenever a court can conduct a meaningful hearing to evaluate retrospectively the competency of the defendant." (internal quotations omitted)). A retrospective competency hearing is "feasible" if there is sufficient evidence available to reliably determine a defendant's competence at or around the time reasonable doubt arose. *Lightsey*, 279 P.3d at 1104-05. To determine whether a retrospective competency hearing is feasible, a trial court must consider the following factors:

> (1) [t]he passage of time, (2) the availability of contemporaneous medical evidence, including medical records and prior competency determinations, (3) any statements by the defendant in the trial record, and (4) the availability of individuals and trial witnesses, both experts and non-experts, who were in a position to interact with [the] defendant before and during

---

[19]The dissent states, "there is nothing for the district court to aggregate on remand." The dissent again confuses reasonable doubt with determining competency in fact. The aggregating principle applies when a court is considering whether there is reasonable doubt such that a hearing is necessary, not *during* a competency hearing when a court determines if a defendant is incompetent in fact under NRS 178.415. Similarly, the dissent's comments regarding the scope of a competency hearing, which are not supported by authority, completely overlook NRS 178.415, the controlling statute.

trial as well as any other facts the court deems relevant.

*Id.* at 1105 (alterations in original) (citation and internal quotations omitted). The trial court's focus in making "the feasibility determination must be on whether a retrospective competency hearing will provide [a] defendant a fair opportunity to prove incompetence, not merely whether some evidence exists by which the trier of fact might reach a decision on the subject." *Id.* (emphasis omitted). "Because of the inherent difficulties in attempting to look back at the defendant's past mental state, the burden of persuasion" is on the prosecution to convince the trial court "by a preponderance of the evidence that a retrospective competency hearing is feasible in this case."[20] *Id.* (citation omitted).

We conclude that vacating the judgment of conviction and ordering a retrospective, or *nunc pro tunc*, competency hearing is the appropriate remedy for the district court's violation. If, on remand,[21] the

---

[20]During oral argument, we asked the parties if it would be feasible at this time to conduct a hearing to determine Goad's competence during his trial. Neither party conceded that it would be feasible, but neither argued that it would be impracticable or impossible. Notably, neither party suggested that there are any impediments in determining the effect of being deprived of the medication Goad was receiving, which would likely be the focus of the feasibility determination and, if feasible, the subsequent *nunc pro tunc* competency hearing.

[21]Remanding a case for the district court to make a determination on a specific issue is not a novel practice for a Nevada reviewing court. *See Harvey v. State*, 136 Nev., Adv. Op. 61, 473 P.3d 1015 (2020) (reversing a judge's rulings on post-trial motions who sat in for the trial judge and remanding the case for the trial judge to consider the motions). *Lightsey* further explains that "a limited remand for the purpose of conducting, if feasible, a retrospective competency hearing is akin to a limited remand to

district court determines that a hearing to retrospectively determine Goad's competence is not feasible in accordance with the forgoing prescripts, then the judgment of conviction remains vacated and the district court is ordered to conduct a new trial.[22] *See id.* at 1120. If the district court determines that a hearing is feasible, then it shall conduct the hearing in accordance with NRS 178.415.[23] If, at the conclusion of the hearing, the district court finds that Goad was competent throughout his 2019 trial, then the court shall reinstate its judgment of conviction. *See* NRS 178.420; *Lightsey*, 279 P.3d at 1120. Alternatively, if the court finds that Goad was incompetent, then the district court must conduct a new trial.[24] *Id.*

---

remedy a sentencing error that has not affected the judgment of guilt." 279 P.3d at 1103.

[22]Pursuant to *Lightsey*, a reviewing court reverses the judgment of conviction and remands the case for a *nunc pro tunc* hearing with instructions to conduct a new trial if the hearing is not feasible or the result of the hearing is that the defendant is found to have been incompetent. *See Lightsey*, 279 P.3d at 1120. We choose to vacate because the judgment of conviction may be reinstated depending on the outcome of the hearing.

[23]In *Doggett v. Warden*, the Nevada Supreme Court, in reviewing a petition for postconviction relief, commented that the burden of proof in a retrospective hearing to determine competency is sometimes allocated to the State. 93 Nev. 591, 595, 572 P.2d 207, 210 (1977) ("It is only when the trial court has failed to follow the procedural requirements of *Pate* that the State is required to forgo its usual requirement that the defendant establish his incompetence as of the date of the original trial."). Because the *Doggett* court reviewed an order denying a petition for a writ of habeas corpus that did not allege a *Pate* violation, and because the decision predates the enactment of Nevada's current competency hearing statute, NRS 178.415, we need not decide its possible application here.

[24]The dissent cites an unpublished case, *State v. Fifth Judicial Dist. Court*, to argue that the Nevada Supreme Court has ruled against the remedy we order here. Docket No. 53926 (Order Granting Petition, Sept.

## CONCLUSION

Trial courts have a duty to ensure that criminal defendants are competent while standing trial. Thus, a trial court must order a hearing sua sponte to determine whether a defendant is competent when there is reasonable doubt about his or her competency. To fulfill its duty to order a competency hearing, a trial court must follow Nevada's statutory competency procedures and consider any evidence of incompetence in the record regardless of whether that evidence was adduced pretrial or during trial. In reaching its reasonable doubt determination, the trial court must consider evidence of incompetence in the aggregate; that is, evidence of incompetence should be considered in light of other evidence of incompetence as well as the court's own observations of the defendant. If a trial court fails to order a competency hearing when reasonable doubt arises, an appellate court may remedy the failure by remanding the case to the trial court to hold a retrospective hearing to determine whether the defendant was incompetent during trial, provided the trial court first determines on remand that it is feasible to retrospectively determine the defendant's competence.

---

25, 2009) ("Nevada law does not permit a trial court to vacate prior proceedings based upon present doubt as to past competency."). Even if this decision bound us, which it does not, *see* NRAP 36(c)(3), our remedy does not vest the district court with power to "vacate prior proceedings." *This court* is vacating the district court's judgment, and the district court will reinstate the judgment of conviction if a competency hearing is feasible and the district court determines that Goad was competent during his trial after the hearing. Otherwise, the district court must conduct a new trial pursuant to *our order*.



Accordingly, we order the judgment of conviction vacated and remand this case for a retrospective competency hearing, if feasible, and any such other proceedings consistent with this opinion.

_____, C.J.
Gibbons

I concur:

_____, J.
Bulla

COURT OF APPEALS
OF
NEVADA

(O) 1947B

TAO, J., concurring in part and dissenting in part:

The majority resolves this appeal by vacating a murder conviction in favor of a remedy—a retrospective competency hearing to be held more than 21 months after the original trial—that Goad himself never requested; that the Nevada Supreme Court has already announced that district courts cannot order; and that doesn't even apply to the facts of this case. The majority ends up vacating a murder conviction for the district court to "aggregate" additional evidence that Goad himself doesn't claim to exist, for the purposes of assessing the truth of something that Goad himself doesn't claim to be true. "There's no there there" to aggregate. Gertrude Stein, *Everybody's Autobiography* (1937). Respectfully, I dissent.

I.

Goad stabbed his victim a total of 250 times in one of the most brutal and bloody murders in recent memory. Goad has been diagnosed with a mental illness, and it's pretty clear that he has one of some sort; the excessive and wanton violence of the crime alone seems to suggest that. But what we don't know is whether his mental illness either did, or did not, render him incompetent on one particular day several months after the murder, day four (August 8, 2019) of his trial. As the majority notes, the record is devoid of sufficient information. For example, as the majority specifically notes (and greatly emphasizes), we don't know much about his precise diagnosis, as he was apparently never examined by a psychologist or psychiatrist during the litigation of this case, and we don't know what medications he was administered during his trial and how they may, or may not, have affected him.

This lack of information matters, because mental illness and legal incompetence are two very different things. Many people who suffer

from various mental illnesses are fully competent to stand trial for the crimes they commit. The test for legal incompetence is altogether different, and considerably harder to meet, than the test for whether someone suffers from one of the many mental illnesses listed in the *DSM* (*Diagnostic and Statistical Manual of Mental Disorders*, published by the American Psychiatric Association). A court measures competence not by whether the defendant has a mental illness, but rather something very different: by the defendant's ability to understand the nature of the criminal charges, the nature and purpose of the court proceedings, and by his or her ability to aid and assist his or her counsel in the defense at any time during the proceedings with a reasonable degree of rational understanding. *Calvin v. State*, 122 Nev. 1178, 1182-83, 147 P.3d 1097, 1100 (2006); *Dusky v. U.S.*, 362 U.S. 402, 402 (1960); *see* NRS 178.400(2)(a)-(c).

"Diagnosis of a mental illness or defect, without more, does not reasonably raise doubt about defendant's competence to stand trial." *Robinson v. State*, 301 So. 3d 577 (Miss. 2020); *see People v. Lara*, (Cal. Ct. App., Dec. 20, 2006, No. B186598) 2006 WL 3734924, at *2 (noting psychologist's evaluation that defendant was mentally ill but not incompetent); *Commonwealth v. Zook*, 887 A.2d 1218, 1225 (Pa. 2005) (affirming trial judge's conclusion that defendant was "mentally ill and not incompetent to proceed"); *Bishop v. Caudill*, 118 S.W.3d 159, 167 (Ky. 2003) (Keller, J., concurring) (noting entire class of cases "where the defendant is mentally ill, but not incompetent"). The Nevada Supreme Court agrees: "[a defendant's] history of drug abuse, possible PTSD, and mental health history, without more, did not indicate that he was unable to consult with his attorney or understand the proceedings against him." *Eubanks v. Baker*, Docket No. 68628, at *1 (Order of Affirmance, May 9, 2016) (citing

*Melchor-Gloria v. State*, 99 Nev. 174, 179-80, 660 P.2d 109, 113 (1983), and *Dusky*, 362 U.S. at 402).

Quite the opposite can often be true: people with mental illnesses can function at such a high level that several have won Pulitzer Prizes and Nobel Prizes for their work. *See* James C. Kaufman, *Genius, Lunatics, and Poets: Mental Illness in Prize-Winning Authors*, SAGE J., Vol. 20, Issue 4, pp. 305-14 (Yale Univ. June 1, 2001); A. Rothenberg, *Creativity and Mental Illness*, Am. J. of Psychiatry, 152:5, pp. 815-16 (1995). Meeting the basic test of legal competency is many orders of magnitude less complex than the kind of sustained genius that wins those kinds of awards. Genius aside, millions of other people diagnosed with mental illnesses are nonetheless fully competent to sign contracts, raise children, be licensed to drive, open bank accounts, write valid wills, hold important jobs, grant or refuse consent to medical treatment, make important life choices without being overruled by a court-appointed guardian, and be put on trial for the crimes they commit. *See Munsey v. State*, 2004 WL 587642 (Tenn. Crim. App. 2004) (finding that a mentally ill defendant was fully competent to waive right to counsel); *In re Yetter*, 1973 WL 15229 (Pa. Ct. Comm. Pleas 1973) (refusing to appoint a guardian to oversee medical decisions for a person who had mental illness but was fully competent to make her own medical decisions). *See generally* Claudine Walker Ausness, Note: *The Identification of Incompetent Defendants: Separating Those Unfit for Adversary Combat From Those Who Are Fit*, 66 Ky. L. J. 666, 679 (1977-78).

On the other hand, people can be incompetent for reasons entirely unrelated to mental illness. Intoxicated defendants, for example, may be incompetent (albeit temporarily). In Nevada, children under six years of age are presumptively incompetent to testify in judicial

proceedings. People suffering from Alzheimer's disease or dementia, or who have suffered certain types of head injuries, may be incompetent despite having no diagnosed mental illness whatsoever. Competence can sometimes come and go; someone can be incompetent to testify at one period in time but fully competent at another. *See Felix v. State*, 109 Nev. 151, 173, 849 P.2d 220, 235-36 (1993), *superseded by statute on other grounds as stated in Springman v. State*, Docket No. 50325 (Order of Affirmance, February 10, 2009).

Of course, it goes without saying that for many people mental illness and competency can be related. Some people suffer from mental illnesses so severe that they render that person legally incompetent, sometimes permanently. But the larger point is that the link between the two things is at best imperfect. The presence of one does not necessarily suggest the other. In fact, the link is so tenuous that mental illness cannot even be said to usually or commonly suggest legal incompetence. *See Robinson*, 301 So. 3d at 582; *Bishop*, 118 S.W.3d at 167 (noting entire class of cases "where the defendant is mentally ill, but not incompetent"). If we're going to get the analysis right, then as the saying goes, we need to make sure apples are sorted with apples and oranges with oranges.

## II.

The answer to our lack of knowledge isn't to vacate the conviction and remand for a retrospective hearing, because that approach turns such a hearing into something it isn't supposed to be: rather than a focused judicial weighing of existing evidence, it becomes a tool of open-ended investigation and discovery requiring the district court to conduct a free-floating fishing expedition for new information totally outside of the record and beyond the evidence that the parties decided to present on their

behalf, regardless of whether the parties want the new evidence or think it helps them or not. Worse, it directs the district court to do this even though Goad did not request such an investigation either before or during trial.

Fundamentally, it reverses not because the district court committed any legal error in evaluating what the parties actually presented, but rather because the majority imagines that there might be some evidence outside the record that the parties overlooked that the court was never asked to consider but that someone ought to now go look for, 21 months after the fact. Mind you, the majority tacitly admits that we don't know what that evidence might be, because it isn't enough for this court to actually conclude that Goad was so clearly incompetent that the district court must conduct a new trial. Rather, the majority expressly leaves open the possibility that the district court is free on remand to conclude that any additional evidence it finds might not be enough to warrant a full competency adjudication, much less demand the conclusion that Goad was incompetent to stand trial on day four. So whatever additional evidence might be out there (whatever it is) could go either way. But let's vacate Goad's murder conviction and require the district court to look anyway.

This isn't how such hearings are supposed to work. They're not supposed to be open-ended discovery searches. Rather,

> [t]his court "disfavor[s] retrospective determinations of incompetence," *see Williams v. Woodford*, 384 F.3d 567, 608 (9th Cir. 2004), and they are reserved for those cases where it is possible to "conduct a meaningful hearing to evaluate retrospectively the competency of the defendant." *Moran v. Godinez*, 57 F.3d 690, 696 (9th Cir. 1995), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63, 75-76, . . . (2003); *see Drope* [*v. Missouri*], 420 U.S. [162,] 183 . . . [(1975)] (holding that "[g]iven the inherent

COURT OF APPEALS
OF
NEVADA

(O) 1947B

> difficulties of such a nunc pro tunc determination under the most favorable circumstances," a retrospective competency hearing six years after the trial was not possible). In determining whether such a hearing is warranted, we evaluate such factors as the passage of time and the availability of contemporaneous medical reports. *Moran*, 57 F.3d at 696; *see also McMurtrey* [*v. Ryan*], 539 F.3d [1112,] 1131-32 [(2008]).

*Maxwell v. Roe*, 606 F.3d 561, 576 (9th Cir. 2010). Requiring one when we have no idea if any concrete evidence even exists risks morphing Goad's trial from an adversarial proceeding into something more like an inquisitorial one (familiar to Europeans) in which the judge, not the parties, directs the investigation, decides where to look, and decides what should matter to the parties whether they like it or not. That might be how things work in Europe, but it's not how we're supposed to handle things. In our adversarial system of justice, when the record lacks information necessary to warrant reversal, the solution is to conclude that the appellant failed to meet his or her burden of demonstrating that he or she is entitled to relief. In Nevada, the burden falls on the appellant trying to overturn a jury verdict to provide us with a complete enough record to make a case for reversal, and if he or she fails to do so we "necessarily presume that the missing portion supports the district court's decision." *Cuzze v. Univ. & Cmty. Coll. Sys. of Nev.*, 123 Nev. 598, 603, 172 P.3d 131, 135 (2007). This premise is sometimes phrased in an alternative: we "cannot properly consider matters not appearing in th[e] record." *Johnson v. State*, 113 Nev. 772, 776, 942 P.2d 167, 170 (1997).

Here, the record contains ample evidence of mental illness, but none whatsoever that Goad has ever been legally incompetent at any time in his long 74-year life. Indeed, he never claimed to be incompetent at any time during the litigation of his murder case: he did not assert a defense of

insanity or diminished capacity in response to the charges, and his trial counsel never argued to the district court that he believed his client was incompetent to stand trial or assist in his defense. Goad and his counsel presented no evidence at all that he has ever been legally incompetent for even a single minute of his life, and Nevada law holds that lack of information against the party bearing the burden of proof on appeal, which is Goad. Yet by reversing anyway, the majority assumes something it doesn't want to say: that by failing to challenge competency more vigorously, Goad's counsel was basically ineffective and two judges of this court are going to give him a second chance to come up with more evidence than he presented the first time. But unlike my colleagues, I'm not willing to jump to the conclusion that counsel failed at his job. Rather, I would think that if anyone knows Goad's mental competence, it would be counsel in close contact with him during the litigation of a murder trial over the course of several months, rather than appellate judges viewing nothing but a written transcript almost two years later.

Quite to the contrary, one fact stands out: Goad doesn't even claim himself that he was incompetent during his trial. In determining whether a full competency hearing is required, courts focus on three factors: the defendant's history of irrational behavior, the defendant's demeanor at trial, and prior medical opinion of the defendant's competence to stand trial. *Melchor-Gloria*, 99 Nev. at 180, 660 P.2d at 113 (citing *Drope*, 420 U.S. at 180). Two of the three are nonexistent by Goad's own admission, and the third supports the district court.

As a starting point, Goad admits that he goes long periods of his life without taking any medication for his mental illness; in fact, he told the police during a recorded and transcribed interrogation that he was

COURT OF APPEALS
OF
NEVADA

(O) 1947B

medication-free for seven years before his arrest, and he never disavows the truth of that statement, not even now. *See* Transcript of March 2019 Police Interview, 1 JA 124: "Q: When was the last time you took, you took your medications? A: 7 years ago . . . . So 7 years I went without medicine." Yet he never claimed to be legally incompetent. In district court, Goad never argued that he was incompetent either before or during trial, and indeed while the district court conducted the canvass that gives rise to this appeal, neither Goad nor his counsel suggested that there existed any past history of incompetency. On appeal, his counsel expressly admitted that there is no evidence that Goad has ever been diagnosed or adjudicated incompetent by any physician or court at any time during his 74-year life, not even during the years when he was medication-free.

> [Court:] [B]ut mental illness and incompetence are two different things, so my question to you is, has he ever in his seventy-four years been adjudicated incompetent by any other court, because it doesn't appear anywhere during the lifespan of this case before trial that anyone raised any questions of his competency despite the fact that he clearly has a mental illness. Has anyone ever, other than this one day in time, had questions about his competency as opposed to his overall mental health?

> [Goad:] . . . In the record, before the district court or anything that was currently in the appellant record there is no other indication that Mr. Goad has been formally adjudicated incompetent by a court.

Notably, the question asked during argument wasn't just whether he's ever been formally adjudicated legally incompetent, but whether anyone has ever "had questions" about his competency, to which the answer was negative. If any such evidence existed, this was certainly the prime moment for counsel to mention it.

Conclusion: there is simply is no evidence that Goad was ever legally incompetent to stand trial for murder, either with or without medication.

Indeed, if you look closely and carefully at both the record and Goad's briefing, Goad himself never actually asserted that he was ever incompetent, either to the district court or, notably, even in his briefing on appeal to this court even after having had almost two years to think about it. The best argument that Goad makes is the cleverly worded one that "due process clearly required that Mr. Goad be evaluated for his competence to stand trial." (Appellant's Opening Brief, page 15.) His "Summary of Argument" elaborates:

> In this case, Mr. Goad was found to be seriously ill on the afternoon of August 7. When he returned to court on August 8, he refused to engage with or acknowledge counsel, and appeared unable to assist counsel in his own defense. Given these circumstances, the district court abused its discretion in failing to initiate formal competency proceedings.

(Appellant's Opening Brief, p. 10.) We all know that Goad was mentally "ill," but notice what's cleverly missing from even Goad's own carefully parsed argument: the factual assertion that he has ever been incompetent, either before August 8, on August 8, or at any time after August 8 through today. His argument is all about day four of the trial, August 8. He concedes (and the majority accepts) that he was fully competent on days one and two of the trial, and then fully competent on every day after day four. But even as to day four itself, nowhere does he go so far as to allege that he actually was, as a medical truth, incompetent. So it appears to me that Goad just wants a reversal of his murder conviction for the purely rhetorical reason that the evidence might suggest victory based upon grounds that he himself

does not personally say were factually true. Unlike the majority, I don't assume that counsel must have done a bad job. Rather, I see this as good and clever lawyering, the kind of quality representation that every defendant facing murder charges deserves to have but relatively few ever get. But good lawyering by itself doesn't mean that reversal is warranted. If Goad can't quite bring himself to say that he was incompetent in truth and in fact, then I would conclude that there exists no "reasonable doubt" about it: it's just not true. At the very least, we must conclude that the existing record supports no other conclusion.

The majority thus remands this matter back to the district court for supposedly failing to "aggregate" evidence that Goad's trial and appellate counsel do not claim to actually exist anywhere in the world. The district court can hardly be faulted for failing to "aggregate" evidence that Goad did not bother to present to the district court when given the opportunity, and even now does not quite say actually exists. If any hearing would be meaningless, this one will be, and during oral argument Goad's counsel quite sensibly agreed:

> [Court:] Is it possible in this situation to send this case back for a competency hearing at this point in time as opposed to a new trial?
>
> [Goad:] Your honor, I don't believe a competency examination at this point in time could establish whether Mr. Goad was competent during that morning of trial, though it may provide more information if we knew what the medication was.
>
> [Court:] Couldn't a hearing determine the answer to the questions [the court] posed?
>
> [Goad:] A hearing could determine the answer to those questions, though it would be difficult to

determine Mr. Goad's mental state on that morning.

[Court:] It would be difficult, but would it be impossible?

[Goad:] I think it would be next to impossible.

There is nothing for the district court to aggregate on remand. The aggregate of zero is zero, and we should affirm.

### III.

The scope and purpose of a retrospective hearing is considerably more limited and narrow than the majority opinion suggests. Its purpose is to answer the narrow question of legal competence, not to conduct a free-wheeling investigation into a defendant's overall mental health just to see what might be lurking there. Thus, the remedy is far from sweeping; to the contrary, it is actually quite narrow. First, it triggers only when there exists "reasonable doubt" regarding competency; it is not supposed to be held for every defendant who happens to suffer from some kind of mental illness unrelated to competency.

Second, the remedy is only an appellate remedy, not one that can be granted by a district court in connection with a post-verdict motion for new trial no matter how much doubt exists regarding competence. The Nevada Supreme Court has already announced that "Nevada law does not permit a trial court to vacate prior proceedings based upon present doubt as to past competency" and a district court that vacates a jury verdict and grants a new trial on this basis "exceeds its authority." *State v. Fifth Judicial Dist. Court*, Docket No. 53926, (Order Granting Petition, Sept. 25, 2009). In that case, the defendant was convicted at trial but behaved erratically during sentencing. The district court ordered and conducted its own retrospective hearing and determined that the defendant had been

COURT OF APPEALS
OF
NEVADA

(O) 1947B

incompetent during trial, and vacated the conviction. The State filed a petition for writ of mandamus, and the Nevada Supreme Court intervened and ordered the district court to restore the guilty verdict, concluding:

> The State challenges the district court's order setting aside the verdict on two grounds: (1) the district court exceeded its authority under NRS 175.381(2) when it set aside the verdict on a ground other than sufficiency of the evidence, and (2) the district court exceeded its authority and abused its discretion when it made a determination as to Yowell's past competency that was not supported by substantial evidence. We agree.
>
> First, a trial court may set aside the verdict and enter a judgment of acquittal if the evidence is insufficient to sustain a conviction. NRS 175.381(2). In the instant case, the district court set aside the verdict because it believed that Yowell was not competent during his trial. There was no allegation, let alone a finding by the district court, that the evidence presented by the State was insufficient to sustain a conviction. Therefore, we conclude that the district court exceeded its authority under NRS 175.381(2) by setting aside the verdict.
>
> NRS 176.515(1) provides that "the court may grant a new trial to a defendant if required as a matter of law on the ground of newly discovered evidence." However, Nevada law does not permit a trial court to vacate prior proceedings based upon present doubt as to past competency.

*Id.* at *2. Thus, a district court's power to vacate a jury verdict and grant a new trial in a criminal case is governed by statute, and the statutes do not authorize courts to grant new trials on grounds other than insufficiency of the evidence. *Id.* Consequently, district courts may not vacate jury verdicts

COURT OF APPEALS
OF
NEVADA

(O) 1947B

and order such hearings themselves after trial. Only appellate courts may order such hearings; district courts have no authority to do so.

Accordingly, the scope of what the majority does today is extremely limited: it applies only to the judges of this court, not to any district courts and not to the Nevada Supreme Court either, which remains free to ignore opinions from lower courts. It is precedent only to us, not any other court either above or below. Because this is only an appellate remedy not available to the district court, the inquiry must be filtered through the appellate standard of review. Whether there exists "reasonable doubt" regarding competency is a question of fact "within the discretion of the trial court" to answer. *Melchor-Gloria*, 99 Nev. at 180, 660 P.2d at 113. Appellate courts are required to defer to the district court on questions of fact.

> An appellate court is not particularly well-suited to make factual determinations in the first instance. *Zugel [by Zugel v. Miller]*, 99 Nev. [100,] 101, 659 P.2d [296,] 297 [(1983)]; 16 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3937.1 (2d ed. 1996) ("Appellate procedure is not geared to factfinding."); *see also Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985) (explaining that a trial court is better suited as an original finder of fact because of the trial judge's superior position to make determinations of credibility and experience in making determinations of fact); *Alburquerque v. Bara*, 628 F.2d 767, 775 (2d Cir. 1980) (remanding habeas petition to district court for additional fact findings because Court of Appeals was not well-suited to make factual findings). An appellate court's ability to make factual determinations is hampered by the rules of appellate procedure, the limited ability to take oral testimony, and its panel or en banc nature.

*Ryan's Express v. Amador Stage Lines*, 128 Nev. 289, 299, 279 P.3d 166, 172-73 (2012).

So, properly framed, the issue before us isn't whether we think there existed "reasonable doubt" regarding Goad's competency; we have no ability to engage in fact-finding when we can't see Goad and all we have before us is a typed transcript of events that happened over 21 months ago. Rather, the issue is whether there exists "substantial evidence" in the record to support the district court's conclusion that no such doubt existed based upon its firsthand personal interaction with Goad at the precise moment in time when his competency was supposedly under suspicion.

IV.

This court reviews the district court's decision to hold or not to hold a more in-depth competency proceeding for an abuse of discretion. *Olivares v. State*, 124 Nev. 1142, 1149, 195 P.3d 864, 869 (2008). Here, Goad is mentally ill, but that tells us little about whether he was incompetent on any particular day of his trial. Even at the ripe old age of 74, Goad admits that there exists precisely zero evidence that he has ever been previously suspected, diagnosed, or adjudicated as legally incompetent at any time in his life by any physician or any court, despite suffering from a mental illness continuously. *See Eubanks v. Baker*, Docket No. 68628, at *1 (Order of Affirmance, May 9, 2016) (a defendant's "history of drug abuse, possible PTSD, and mental health history, without more, did not indicate that he was unable to consult with his attorney or understand the proceedings against him"). Did the district court "abuse its discretion" in finding that a formal competency hearing was unnecessary? Here's what the trial record says.

During six months of pretrial litigation between Goad's arrest and trial (from March to August 2019), neither he nor his counsel ever placed his competency into question. I would think that counsel in close quarters with Goad while preparing for a murder trial would know plenty that we do not, and would raise the matter on even the slightest sniff of a problem. Nothing. The district court was asked to resolve a series of pretrial motions, none of which raised any question about Goad's competency (motion to admit/exclude evidence of Goad's eviction/financial issues, motion to exclude prior bad acts, motion to exclude prejudicial photos and videos).

If anything, the pretrial record cuts the opposite way. The only pretrial motion relating in any way to Goad's mental health was a motion to admit/exclude a recording/transcript of police interrogation in which Goad describes his mental health history in some detail but never claimed any prior diagnosis of incompetency. During it, Goad claimed (all unverified) that he spent time in various mental health facilities (at UC Davis, in Glendale, and in Galletti) and suffers from what he described as "depression" and at one time took the medications Amitripyline to help him sleep and Ativan for "shakes." However, he asserted that the last time he took those medications was seven years before the interrogation. Therefore, by his own admission, he does not need medication to be legally incompetent. Perhaps the medication reduces the severity of the symptoms of his mental illness. But when he admits that he has not received medication for seven years, and then counsel adds that he has never been diagnosed or adjudicated incompetent, the last step of the syllogism becomes obvious: the district court correctly concluded that there is simply

Court of Appeals
of
Nevada

(O) 1947B

no evidence that Goad needs medication to be legally competent to stand trial for the crime of murder.

So Goad's competency was never questioned before trial and has apparently not been questioned in the 21 months that have elapsed since trial until now. What about the trial itself? In evaluating whether a full competency hearing is required, trial courts must consider their own observations of the defendant's behavior. *Melchor-Gloria*, 99 Nev. at 180, 660 P.2d at 113; *Drope*, 420 U.S. at 180. Goad concedes that he was fully competent on days one and two of the trial, and then fully competent on every day of the trial that took place after day four. Even on day four, he concedes (as will soon become apparent) that he was competent by the early afternoon.

The only issue is what happened during part of the morning of day four, as he was fully competent after lunch. Here's what the trial transcript says about Goad's behavior during the events of that day.

On day three of Goad's trial, the district court stated shortly after the lunch break:

> I've observed a difference in Mr. Goad's physical appearance today. And during the lunch hour, just in the last five minutes, Deputy Cross came to me and said that there had been some inquires about Mr. Goad's health. I asked him if Mr. Goad's attorneys were aware of it, and he said that they had been here for the entire break.

A deputy court marshal then stated on the record that he was "advised of the change of behavior" and was in contact with medical staff, which revealed that Goad did not receive a medicine that day. The deputy further noted the medication was the "type that cannot wait until the end of our normal business day." The deputy recommended stopping proceedings for the day and taking care of Goad.

COURT OF APPEALS
OF
NEVADA

(O) 1947B

The district court then asked defense counsel for his impressions, to which counsel responded that Goad was "worse than he was this morning" and was degrading physically. Notably, counsel did not question Goad's ability to communicate with him or assist in defending the trial, despite the judge's express invitation. The district court then said, "I think it's appropriate that we recess for the day. And if that means that it pushes the trial back, that's what it means. Mr. Goad is entitled to be present and well as he both observes trial and participates with his attorneys privately." The district court then sent the jury home, after which Goad received his medication.

Trial reconvened the next day at 9 a.m. Defense counsel started by notifying the district court that Goad was unresponsive and failed to acknowledge his attorneys. The record indicates, however, that Goad was responsive with the marshals and courtroom deputies. Defense counsel next said, "So what I would be interested in this morning is just the Court to ask Mr. Goad if he understands why we're here and what we're doing. And if he could acknowledge that to the Court I would feel comfortable going forward." Notably, counsel did not express the belief that Goad was incompetent, and did not request the full competency hearing that the majority now says was necessary. The district court responded:

> I'm not going to conduct some form of informal mini mental examination from the bench. This trial is going to proceed with or without Mr. Goad's presence or participation. I want Mr. Goad to be present. But if Mr. Goad, for example, chose not to accept the transport I'd quickly do some legal research but I—I have a sense that without any competent jury this trial proceeds.
>
> So I'm going to ask Mr. Goad about being here, I'm going to acknowledge him, express my gratitude

COURT OF APPEALS
OF
NEVADA

(O) 1947B

that he's here, my hope that he remains, but I'm not going to make findings about his cog nature.

The following is the interaction the district court had with Goad.

[Court:] Mr. Goad, good morning. And you've just raised your hand to say hello to me in gesture. Are you having a hard time speaking?

[Goad:] (Nods head.)

[Court:] Yes, you're nodding your head yes. The record will reflect that I'm looking directly at Mr. Goad and he is looking at me as I speak to him. Our eyes are communicating with each other, and he's nodding his head yes. But you're not able to speak this morning; is that correct?

[Goad:] (No audible response.)

[Court:] So Mr. Goad has attempted to make noise with his throat and he's held his hand up to his throat indicating there may be some problem with his ability to use words this morning.

Mr. Goad, do you know who I am? Not my name, but do you know what I do? Yeah, you're nodding your head yes. And these are your two attorneys. And you're nodding your head and saying yes and waving to them.

Are you able to write at all? Yes? So what I'll do is at defense counsel's request, if at any time you want to communicate with your attorneys, just let Ms. Mayhew know, she'll stand and let me know, and . . . we'll let you write a note to them. I'm not sure what's going on.

Has Mr. Goad been medically cleared from the infirmary? The deputies are answering yes, he has, and he is nodding his head yes.

COURT OF APPEALS
OF
NEVADA

(O) 1947B

Mr. Goad, is it—will you just raise your hand if you want this trial to proceed? Yes. He's raising his hand immediately.

All right. That's enough of a canvass for me.

The district court then called the jury in and the trial proceeded. By early that afternoon, Goad's counsel entered the following observation into the record:

> What I want to let the court know is it's as if the medication that he was given yesterday has a time frame in which it actually has its effect. Because I have noticed a marked difference now with respect to Mr. Goad and his ability to communicate with me. . . . It's as if the medication took a while to have its effect, this morning it hadn't fully activated.

Thus, any issue that Goad had during the morning of day four was resolved by that afternoon.

## V.

Notably, at no point during this lengthy exchange did defense counsel argue that Goad was incompetent or suggest that there existed some additional evidence bearing on competency that the court should consider. Counsel's concern was not that Goad was incapable of understanding enough to proceed, but only that he was being difficult and obstinate toward his attorneys (as he was simultaneously responsive to the courtroom marshals and the judge's canvass). Obstinacy is an entirely different problem than competency. Being difficult, even to the extent of being overtly rude and dismissive to counsel, is not the same thing as being incapable of understanding the nature of the proceedings.

Even to the extent that this exchange suggests something about competency rather than mere stubbornness, on appeal the question isn't whether we agree with the district court's observations. We can't see them,

COURT OF APPEALS
OF
NEVADA

(O) 1947B

so we have no basis to either agree or disagree. The only question is whether the record indicates that the district court did what it was supposed to do, which is personally evaluate Goad's demeanor, and it did. The only other question is whether the record contains "substantial evidence" supporting the district court's conclusion that it did not need to probe further into Goad's competency, and without being able to see Goad ourselves, we must say that it does.

What this exchange tells us is this. Of the three things courts must weigh to determine whether a full competency hearing is required—the defendant's history of irrational behavior, his demeanor at trial, and prior medical opinion of his competence to stand trial—two of the three are nonexistent by Goad's own admission (no evidence of any prior history of behavior suggesting incompetency, no prior medical diagnosis of incompetency), and the third (Goad's demeanor at trial) is something the district court saw, made an extensive record about, and we cannot see ourselves on appeal. *See Melchor-Gloria*, 99 Nev. at 180, 660 P.2d at 113 (citing *Drope*, 420 U.S. at 180). Then on top of that, Goad doesn't even quite assert that he was incompetent at the moment in question on day four, nor did his attorneys suggest that there existed some other evidence the court should consider when given an opportunity to do so. When all three of the factors, plus Goad's own argument, come out in favor of the district court, our inquiry ought to end there.

VI.

The majority nonetheless remands for the district court to review such things "in the aggregate" as medical records pre-dating the trial, Goad's medication and dosage during the trial, and even the gruesome facts of the crime itself six months earlier, in the apparent belief that, if the

district court looks, maybe something about competency might come up. But that's not how the legal test works. The district court isn't supposed to conduct a full-blown hearing and investigation (and we're not supposed to reverse if it doesn't) until there first exists some threshold reason to believe that there's something worth finding. When Goad himself doesn't say there's anything at all to uncover—when he fails to mention any evidence of incompetence to the district court and then admits on appeal that there is no evidence that he has ever been adjudicated incompetent—then the district court was well within its bounds to conclude that the threshold was not met and a hearing would be meaningless. *See Maxwell*, 606 F.3d at 576.

Perhaps one could take the position that there's no harm in trying to get more information, especially when the stakes involve a brutal murder and are at their highest. But I'm of a mind that courts must deal with the real rather than the conjectural, limiting ourselves to evidence for which a strong case has been made to actually exist, not merely hypothetical evidence that might exist in theory but not anywhere in the record we have. Courts aren't supposed to tolerate "fishing expeditions" in civil discovery, and we're certainly not supposed to order district courts to engage in them ourselves. *See Groom v. Standard Ins. Co.*, 492 F. Supp. 2d 1202, 1205 (C.D. Cal. 2007) ("[D]iscovery must be narrowly tailored and cannot be a fishing expedition."). Similarly, we're not supposed to vacate murder convictions on appeal just because the district court failed to conduct its own sua sponte search for something that Goad never claimed to exist. The idea of a retrospective hearing assumes a reason to believe that there actually was some concrete evidence that the district court failed to consider. When there is no reason to believe that such evidence exists, a retrospective hearing will

COURT OF APPEALS
OF
NEVADA

(O) 1947B

accomplish nothing except waste time and resources in the pursuit of nothing useful to add to the existing record.

Could additional evidence nonetheless still be found if the district court looks further on remand, even though Goad himself doesn't assert that any such evidence exists? I suppose it's conceivable. As noted astronomer Carl Sagan used to say, absence of evidence is not necessarily evidence of absence. Carl Sagan, *The Demon-Haunted World: Science as a Candle in the Dark* 213 (Ballantine, 1st ed. 1997). Lots of things that seem implausible today might turn out to be true tomorrow. *See* 2019 Chapman University Survey of American Fears (CSAF) (reporting that 57% of Americans believe in the existence of the lost continent of Atlantis and more than 1 in 5 believe that Bigfoot exists), published in Christopher D. Bader et al., *Fear Itself: The Causes and Consequences of Fear in America* (NYU Press 2019), available at https://www.chapman.edu/wilkinson/research-centers/babbie-center/survey-american-fears.aspx. Likewise, it's theoretically possible that some additional evidence of incompetence might exist somewhere in the universe even though Goad's own counsel never mentioned any, either to the district court or on appeal. Even completely random discovery "fishing expeditions" occasionally do uncover meaningful evidence.

But when the overall standard of appellate review is "abuse of discretion" and the district court decides as a factual matter that no additional hearing is warranted, the standard we apply—the standard that Nevada appellate courts have applied in literally thousands of cases—is whether the court's decision is supported by "substantial evidence." *Ogawa v. Ogawa*, 125 Nev. 660, 668, 221 P.3d 699, 704 (2009). In the thousands of cases we've handled over the past six years, we have never assessed

COURT OF APPEALS
OF
NEVADA

(O) 1947B

"substantial evidence" by speculating about hypothetical evidence that appeared nowhere in the record and was never presented to the trial court. "Substantial evidence" is assessed by looking at the evidence actually in the record before the court and asking whether it was enough to justify the finding. Once we enter into the realm of speculation, there can always be hypothetical countervailing evidence that might go the other way, whether it's a criminal case, workers' compensation case, or family law case. But we don't engage in that kind of speculation; at least, we never have before. If we did, no verdict could ever stand up on appeal because someone could always imagine the possibility of something more to find if someone else just looks a little harder.

Legality aside, consider as a practical matter how unlikely it really is that there could be something to find anyway. Goad admits on appeal that there is no evidence of past incompetence. Beyond that admission, can someone be legally competent every day for the entirety of a 74-year life, but yet incompetent for only a couple of hours one morning before becoming fully competent again by the early afternoon? Sure, it's possible. Just not in any way that matters to this case. One could be drunk or high on drugs that quickly wear off. Maybe one could suffer the effects a concussion that impairs cognitive ability for a few hours. People suffering from Alzheimer's or dementia can sometimes float in and out of competency. But Goad wasn't suffering from any of this. Looking to mental health records from some other time well before trial might make sense if a defendant had a long history of floating in and out of legal competency over time. If someone was legally incompetent in the past, that suggests at least the possibility of being legally incompetent again later. But here, there's no evidence whatsoever that Goad was incompetent at any other time of his

life, including even later during the afternoon of the same day, so evidence of Goad's mere mental illness months, weeks, or days before trial tells us nothing about whether he was legally competent for part of the morning of the fourth day of trial. As the majority notes, even assuming as true that there was incompetence for part of the morning of day four, that was only because the triggering event was Goad not being given medication that morning. So what, exactly, is the relevance of his mental health months or weeks earlier before trial when things were very different and Goad himself states that he was medication-free for seven years before trial yet was never suspected of being legally incompetent, much less adjudicated so?

The bottom line is that the question at hand—whether someone who's been competent their entire life suddenly became incompetent for only a couple of hours one morning or not—is a fundamentally factual one which, in this case, the district court answered in the record in detail and at length based upon its personal interactions with Goad and its observations of his behavior. The district court is expressly required to consider its own observations about the defendant's demeanor, which we cannot see and can never second-guess. *Melchor-Gloria*, 99 Nev. at 180, 660 P.2d at 113 (citing *Drope*, 420 U.S. at 180). The district court personally canvassed the defendant, made remarks and observations about the defendant's nonverbal conduct and in-court behavior, and then immediately found that there was no need to go further. It clearly gave a lot of weight to its personal observations. We must give deference to those observations which we cannot see in a typewritten transcript and therefore ought not second-guess. And deference on a purely factual matter means that, whenever the district court's factual findings are supported by any substantial evidence at all, we must affirm.

COURT OF APPEALS
OF
NEVADA

(0) 1947B

## VII.

The district court was confronted with a factual inquiry that it answered based upon personal observations that we cannot see. Instead of speculating that there may be more evidence out there somewhere in the ether that the district court should investigate now, more than 21 months later, I would affirm.

_____, J.
Tao

COURT OF APPEALS
OF
NEVADA

(O) 1947B